**2020 IL 125017**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 125017)

DENNIS TZAKIS *et al.*, Appellees and Cross-Appellants, v.
MAINE TOWNSHIP *et al.*, Appellants and Cross-Appellees.

*Opinion filed November 19, 2020.*

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Anne M. Burke and Justices Garman, Karmeier, Neville, and
Michael J. Burke concurred in the judgment and opinion.

Justice Kilbride took no part in the decision.

## OPINION

¶ 1     The primary issue we are asked to address is whether our decision in *Coleman
v. East Joliet Fire Protection District*, 2016 IL 117952, abolishing the common-
law public duty rule, applies retroactively to this case. The circuit court of Cook
County dismissed plaintiff property owners' "amended fifth amended complaint"

(hereinafter the sixth amended complaint) against defendant local public entities. The circuit court found that the public duty rule applied to all of defendants' alleged conduct and the new law set forth in *Coleman* applied only prospectively here. The appellate court affirmed in part and reversed in part the judgment of the circuit court. 2019 IL App (1st) 170859, ¶ 107. For the following reasons, we affirm the judgment of the circuit court.

¶ 2                                    BACKGROUND

¶ 3         This appeal arises from a lawsuit initially filed by plaintiffs on February 11, 2009, concerning flood damage to their property in the Robin-Dee community area of Maine Township after heavy rains on September 13, 2008.[1] Plaintiffs filed suit against several local public entities including the three defendants in this appeal— Maine Township, the City of Park Ridge (Park Ridge), and the Metropolitan Water Reclamation District of Greater Chicago (District). Plaintiffs alleged that defendants breached a variety of duties owed to them with respect to a stormwater drainage system located near their properties.

¶ 4         On January 13, 2012, plaintiffs filed their sixth amended complaint.[2] Plaintiffs alleged that defendants, in coordination with private partners, developed the Prairie Creek Stormwater System (PCSS). According to the complaint, the PCSS is a stormwater system consisting of the central main drain that runs through the Robin-Dee neighborhood; retention/detention basins for stormwater storage including three basins, along with the tributary stormwater sewers that feed the basins; and the tributary stormwater sewers "under the streets collect[ing] street stormwater runoff which then drain[s] to the [m]ain [d]rain or its storage components."

---

[1]This lawsuit seeks damages resulting from the flooding event on September 13, 2008. Plaintiffs filed four additional lawsuits against defendants after subsequent flooding occurred. The trial court consolidated those lawsuits (Nos. 10-CH-38809, 11-CH-29586, 13-CH 10423, and 14-CH 6755) with this one, and its subsequent dismissal order applied to all five lawsuits.

[2]The complaint is 299 pages long and contains more than 1500 allegations, including numerous allegations that plaintiffs were allowed to strike out with black lines. Additionally, the appendix to the record fails to describe in any detail the nature of each document, order, or exhibit contained therein. See Ill. S. Ct. R. 342 (eff. Oct. 1, 2019). We have attempted to summarize the allegations contained in the complaint and the relevant documents contained in the record.

Defendants were allegedly involved in approving the drainage and sewer systems as far back as the 1960s.

¶ 5 Advocate Health and Hospital Corporation (Advocate) operates a hospital adjacent to plaintiffs' neighborhood. In 1976, Advocate submitted a development plan to Park Ridge that proposed modifications to Advocate's drainage system. It was further alleged that Park Ridge approved the proposal and that Advocate's alterations from the 1976 routing of the main drain resulted in increased water flow into the Robin-Dee community.

¶ 6 In 1987, plaintiffs' neighborhood experienced significant flooding. In response, Maine Township, Park Ridge, and the City of Glenview, "along with other entities," commissioned Harza Engineering Services (Harza) to investigate. In 1990, Harza issued a report, which identified maintenance and design defects in the PCSS that allegedly posed the risk of future flooding. Specifically, Harza identified design and maintenance defects in Advocate's drainage system, including the portions adjacent to plaintiffs' property. The report indicated that the defects impaired the system's drainage capacity in certain areas to a level substantially below any reasonably safe standard for the collection, transportation, and discharge of stormwater within the PCSS.

¶ 7 At some point between 1987 and 2002, Advocate hired the engineering firm Gewalt Hamilton Associates, Inc. (Gewalt), to draft and implement a development plan for property contiguous to the hospital. This development included modifications to the drainage system and the topography of the property itself. Park Ridge and the District issued permits related to this development of Advocate's property.

¶ 8 In August 2002, a rainstorm again caused major flooding to the Robin-Dee neighborhood. Stormwater accumulated within Advocate's drainage system. Plaintiffs alleged that the system's discharge component was undersized, which caused water to build up and overflow from the system, causing the flooding.

¶ 9 After the 2002 event, the Illinois Department of Natural Resources conducted a study that discovered "numerous bottleneck and obstructions to flow as the causes of the invasive flooding" in the Robin-Dee community. The study provided recommendations that could be made to reduce future flooding. Thereafter,

Advocate and Gewalt submitted plans to modify the drainage system at the hospital, which were approved by Park Ridge and the District. Plaintiffs alleged that the plans to modify did not address the three undersized components of Advocate's drainage system. Additionally, the plan allegedly did not remedy certain bottlenecks that led to an insufficient means to drain water from Advocate's property.

¶ 10    On September 13, 2008, stormwater overflowed the retention basins on Advocate's property, causing flooding to plaintiffs' property and leading to the damages that they seek to recover in this lawsuit. Plaintiffs alleged that culverts intended to discharge water from the basins were insufficient because the discharge from the basins bottlenecked. Once the bottleneck reached capacity and the basins filled, water discharged over the top of the basins onto Advocate's property and then flooded plaintiffs' property below. Plaintiffs alleged that the stormwater drains were insufficient to drain water from the streets into the PCSS. They further alleged that defendants controlled the Prairie Creek main drain and its various segments as well as the property for stormwater management.

¶ 11    Concerning Maine Township, plaintiffs alleged that it was responsible for stormwater management within the jurisdiction, which included plaintiffs' neighborhood, and it had supervised all stormwater projects. Additionally, Maine Township "owned[,] possessed and/or controlled" the portions of the PCSS within its jurisdiction. Plaintiffs alleged that Maine Township had mobilized trucks for sand delivery to their neighborhood in anticipation of the flooding event that occurred on September 13, 2008. Maine Township had also provided sandbags on prior occasions when there had been flooding.

¶ 12    Concerning Park Ridge, plaintiffs alleged that the city had owned, controlled, planned, and designed the public improvements to the PCSS within its jurisdiction. The city allegedly had the most actual knowledge of Advocate flooding among the local public entities and was in the best position to make changes to the Advocate-Gewalt plans given the serious repetitive flooding history. Plaintiffs alleged that "Park Ridge did not compel Advocate[ ] to revise their North and South Development Plan to provide more stormwater storage." Plaintiffs further alleged that Park Ridge was aware of the repetitive invasive flooding to the Robin-Dee

community because it had deployed police and public safety personnel to the area during flooding events.

¶ 13        Concerning the District, plaintiffs alleged that it was the regional local public entity charged with operation of stormwater management across jurisdictions and that it "own[ed] and/or control[led] all drains, basins, structures, components and other stormwater improvements" within the PCSS system. Despite having knowledge of design and maintenance defects within the PCSS, the District allegedly did not take "corrective measures to remedy and/or protect the plaintiffs against the foreseeable dangerous conditions existing on its PCSS properties posed by excess stormwater." Plaintiffs further alleged that the District approved plans from Advocate relating to Advocate's design of PCSS components on its property.

¶ 14        In the complaint, plaintiffs brought the following counts against each of the three defendants before us: (1) "negligence: dominant estate overburdening stormwater," premised on allegations that defendants knew or should have known of the foreseeable harm of invasive flooding into plaintiffs' neighborhood due to the history of flooding and that they owed nondelegable duties to manage properly the stormwater so as to prevent harm to plaintiffs from excess stormwater overburdening the drainage system; (2) "negligent nuisance," premised on allegations that defendants negligently caused an accumulation of water from the drainage system to invade and interfere with plaintiffs' property; (3) "negligent trespass," premised on allegations that water invaded plaintiffs' property due to defendants' failure to properly manage the stormwater systems; (4) "statutory duty to maintain property," premised on allegations that defendants failed to exercise ordinary care to maintain their property in a reasonably safe condition as required by section 3-102(a) of the Tort Immunity Act; (5) "duty to remedy [a] dangerous plan," premised on allegations that defendants had a duty to compel Advocate to redesign its drainage plans under section 3-103 of the Tort Immunity Act, which set forth a duty for a local public entity to correct known unsafe conditions related to the design and/or engineering of an approved plan; and (6) "taking real and personal property," premised on allegations that defendants' conduct constituted a taking of private property without just compensation in violation of the Illinois Constitution (Ill. Const. 1970, art. I, § 15). In the takings counts, plaintiffs alleged that their property became partially or totally uninhabitable by defendants' conduct

in "failing to redesign the PCSS Robin-Dee Main Drain" and "failing to redesign its PCSS Properties."[3]

¶ 15    On August 15, 2014, Maine Township, Park Ridge, and the District each filed motions to dismiss the complaint. The motions asserted, in pertinent part, that the complaint should be dismissed under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2014)) because they owed no duty to plaintiffs under the public duty rule and plaintiffs had not alleged any special duty owed to them.[4]

¶ 16    On April 3, 2015, the trial court granted defendants' motions based on the public duty rule. The court found that plaintiffs had not alleged sufficient facts to infer the existence of any actionable duty on the part of defendants. The court found that the public duty rule applied to all of defendants' alleged conduct and that no special duty existed.

¶ 17    On May 4, 2015, defendants filed a motion for a finding that there was no just reason to delay enforcement or appeal from the trial court's order. See Ill. S. Ct. R. 304(a) (eff. Feb. 26, 2010). In response, plaintiffs asserted that the trial court's order did not encompass the takings clause counts, and the parties engaged in additional briefing on that issue.

¶ 18    On January 22, 2016, before that issue was resolved, this court abolished the public duty rule in *Coleman*. The public duty rule provided that a local governmental entity does not owe any duty to individual members of the public to provide adequate governmental services. *Coleman*, 2016 IL 117952, ¶ 37.

¶ 19    On February 8, 2016, plaintiffs filed a motion to reconsider the dismissal of the complaint based on *Coleman*. Defendants responded that the new law established in *Coleman* should only be applied prospectively. The trial court initially granted plaintiffs' motion to reconsider, vacating its dismissal order.

---

[3]Additional counts had been asserted against defendants, which were dismissed. Plaintiffs ultimately proceeded only on these six claims against each defendant.

[4]On March 25, 2010, defendants filed their first motion to dismiss. They raised the public duty rule and continued to assert that argument in subsequent motions to dismiss.

¶ 20    On February 1, 2017, based on additional argument, the trial court vacated that order and reinstated the dismissal. The trial court found that the new law set forth in *Coleman* should not be retroactively applied in this case, noting that defendants had been raising the public duty rule since their initial motion to dismiss in 2010 and continued to raise it in their subsequent motions to dismiss. The trial court also found that the retroactive application of the law would involve substantially more litigation preparation than could have been predicted and that "[t]his is a hardship on the [defendants] and their taxpayers considering the unpredictable and unexpected reversal of longstanding law, the complexity of the case, and the passage of time."

¶ 21    The appellate court reversed, in part, finding that *Coleman* did apply retroactively and, therefore, the public duty rule did not apply to plaintiffs' claims. 2019 IL App (1st) 170859, ¶ 49. The appellate court, on other grounds, affirmed the trial court's dismissal of the counts premised on adjacent property owner liability, the duty to maintain property, and the duty to remedy a dangerous plan.[5] *Id.* ¶ 107. The appellate court found, however, that plaintiffs' claims under the takings clause, as well as their tort claims of negligent nuisance and negligent trespass, were sufficient to withstand a motion to dismiss under section 2-615 of the Code. *Id.*

¶ 22    This court allowed defendants' petition for leave to appeal. Ill. S. Ct. R. 315(a) (eff. July 1, 2018).


¶ 23                                    ANALYSIS

¶ 24                              I. The Public Duty Rule

¶ 25    Defendants contend that the appellate court erred by applying *Coleman* retroactively in this case and, thus, holding that the public duty rule is inapplicable to plaintiffs' claims against them.

---

[5]On appeal, plaintiffs abandoned their dominant estate overburdening claim but argued that the facts gave rise to an "adjacent property owner claim." The appellate court found no basis to apply such liability to defendants. See 2019 IL App (1st) 170859, ¶¶ 68, 71.

¶ 26    The trial court dismissed plaintiffs' sixth amended complaint, pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2014)), due to the lack of duty owed under the public duty rule and the failure to allege any special duty. A motion to dismiss under section 2-615 challenges the legal sufficiency of the complaint by alleging defects on its face. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 13. A cause of action should not be dismissed pursuant to that section unless it is clearly apparent that no set of facts can be proved that would entitle the plaintiff to recovery. *Id.* We review *de novo* a dismissal under section 2-615. *Id.*

¶ 27    Generally, when a court files an opinion, the decision is presumed to apply both retroactively and prospectively. *Tosado v. Miller*, 188 Ill. 2d 186, 196 (1999). This presumption can be overcome in two types of circumstances. First, the issuing court itself may expressly state that its decision will be applied prospectively only. *Aleckson v. Village of Round Lake Park*, 176 Ill. 2d 82, 86 (1997). Second, a court may, under certain circumstances, override the presumption by declining to give the previous opinion retroactive application with respect to the parties appearing before it. *Id.*

¶ 28    This court in *Coleman* did not expressly address whether the decision abolishing the public duty rule would only apply prospectively. When no such express statement has been made, we have recognized that the following three factors are relevant in determining whether a prospective application is proper:

> "(1) whether the decision to be applied nonretroactively established a new principle of law, either by overruling clear past precedent on which litigants may have relied or by deciding an issue of first impression whose resolution was not clearly foreshadowed; (2) whether, given the purpose and history of the new rule, its operation will be retarded or promoted by prospective application; and (3) whether substantial inequitable results would be produced if the former decision is applied retroactively." *Tosado*, 188 Ill. 2d at 197 (citing *Aleckson*, 176 Ill. 2d at 92-94).

¶ 29    As to the first factor, defendants correctly assert that *Coleman* clearly established a new principle of law by overturning decades of existing precedent. The lead, special concurrence, and dissenting opinions all recognized that the outcome of the case abandoned or abolished the public duty rule, and this court explicitly stated that it was overruling past precedent. See *Coleman*, 2016 IL

- 8 -

117952, ¶¶ 53-54 (lead opinion of Kilbride, J., joined by Burke, J.); *id.* ¶ 67 (Freeman, J., specially concurring, joined by Theis, J.); *id.* ¶ 80 (Thomas, J., dissenting, joined by Garman, C.J., and Karmeier, J.).

¶ 30        As to the second factor, defendants contend that a prospective application would not frustrate the purpose and history of the new rule announced in *Coleman*, while plaintiffs assert the opposite view.

¶ 31        The holding in *Coleman* abolishing the public duty rule was the result of two rationales. The lead opinion recognized that this court had consistently held that the rule survived the abolition of sovereign immunity and the passage of the Tort Immunity Act, but it found that the time had come to abandon the rule and its special duty exception. *Id.* ¶ 52 (Kilbride, J., joined by Burke, J.). Three reasons were identified for abolishing the public duty rule: (1) its application was muddled and inconsistent, (2) continued application of the rule was incompatible with the limited legislative grant of immunity for willful and wanton conduct and (3) public policy is primarily the determination of the legislature and, because the general assembly enacted statutory immunities, the rule was obsolete. *Id.* ¶ 54. The special concurrence reasoned that the public duty rule should be abolished because it was rooted in the same concepts underlying sovereign immunity and that, when the 1970 Constitution abolished all forms of nonstatutory immunity, the judiciary's power to apply the public duty doctrine ceased to exist as a means of assessing municipal tort liability. *Id.* ¶ 68 (Freeman, J., specially concurring, joined by Theis, J.).

¶ 32        We recognize, as noted by the appellate court, that the facts and timing of this case and our disposition of *Coleman* are unique. If defendants had obtained a dismissal based upon the public duty rule when they first raised the issue in 2010, the judgment would have been final and appealable well prior to this court's 2016 decision in *Coleman*. Given the circumstances of this case and based upon the varied reasons provided by the two rationales for abolishing the public duty rule, we cannot say the new law announced in *Coleman* would be thwarted by applying a prospective application here.

¶ 33        Turning to the third factor, defendants argue that it would be inequitable to apply *Coleman* retroactively. They assert that they have consistently raised the public duty rule in their motions to dismiss over a period of years and that the

conduct alleged by plaintiffs all occurred between 8 and 56 years before the public duty rule was abolished. Plaintiffs respond that they have suffered significant damages as a result of defendants' conduct surrounding the stormwater system and that it would not be inequitable, or cause defendants hardship, to find that the public duty rule does not bar this cause of action from proceeding.

¶ 34        Our decision in *Molitor v. Kaneland Community Unit District No. 302*, 18 Ill. 2d 11 (1959), is most helpful to understanding why it would be proper to apply a prospective-only application to *Coleman*. In *Molitor*, this court abolished governmental tort immunity of school districts for the negligence of their employees. *Id.* at 24-25. In departing from *stare decisis*, we recognized that justice and policy required such a departure but were cognizant of the fact that a retroactive application of the decision may have resulted in great hardship to school districts that had relied upon prior decisions upholding the doctrine of tort immunity. *Id.* at 26. Consequently, we held that justice would best be served by holding that, except as to the plaintiff who brought the case successfully challenging governmental tort immunity, the new rule should apply only to cases arising out of future occurrences. *Id.* at 26-27. We found that result would be in accord with a substantial line of authority endorsing the theory that a decision overruling past precedent should be given only prospective application whenever injustice or hardship due to reliance on the overruled decision would be averted. *Id.* at 27.

¶ 35        Here, as the trial court highlighted in dismissing the complaint, between February 11, 2009, when the initial complaint was filed, and January 13, 2012, when the sixth amended complaint was filed, numerous motions to dismiss had been filed by defendants. Their first such motion was filed on May 25, 2010, raising the application of the public duty rule. Defendants continued to argue for the application of the rule in their subsequent motions to dismiss. Their position on the public duty rule ultimately prevailed, and the trial court dismissed the complaint against them prior to this court's issuance of *Coleman*.

¶ 36        Plaintiffs seek to hold defendants liable for actions surrounding the review, approval, construction, maintenance, and operation of a stormwater system going back 60 years. At the time of any alleged conduct in the complaint, the public duty rule existed. If *Coleman* were applied retroactively, it would result in this 11-year-old case requiring even more litigation, including a possible change in the legal

theory of the case advanced by defendants, due to the unexpected abolishment of the long-standing public duty rule. As in *Molitor*, we find that a prospective application of *Coleman* is proper and would avoid substantial inequitable results for defendants who have relied upon the public duty rule throughout the long course of this litigation.

¶ 37     For these reasons, we find the factors favor limiting *Coleman* to a prospective-only application in this case. See, *e.g.*, *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 285-86 (2009) (giving prospective application to our holding that an electric utility was entitled to a certain tax credit; because the issue was a matter of first impression, its resolution was not clearly foreseen, and retroactive application was not necessary and could cause difficulties and uncertainty); *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 529-30 (1993) (giving prospective application to our holding overruling past precedent that a plaintiff's settlement with an agent would automatically extinguish the vicarious liability of the principal, regardless of a reservation of rights, because retroactive application would have been unjust and caused great hardship); *Gibellina v. Handley*, 127 Ill. 2d 122, 138 (1989) (giving prospective application to a new supreme court rule because it represented a clear departure from prior precedent and fairness so required).

¶ 38     Having determined that *Coleman* does not apply retroactively to this case, we turn to defendants' argument on the merits—namely that the trial court correctly concluded that the public duty rule barred the claims.

¶ 39     The public duty rule, as it existed prior to *Coleman*, provided that a local governmental entity is not liable in tort and owed no duty to individual members of the public when performing customary governmental duties for the public at large. *Harineck v. 161 North Clark Street Ltd. Partnership*, 181 Ill. 2d 335, 345 (1998). The rationale behind the rule was that "a municipality's duty is to preserve the 'well-being of the community' and that such a duty is 'owed to the public at large rather than to specific members of the community.' " *Zimmerman v. Village of Skokie*, 183 Ill. 2d 30, 44 (1998) (quoting *Schaffrath v. Village of Buffalo Grove*, 160 Ill. App. 3d 999, 1003 (1987)). An exception to the public duty rule was the "special duty exception," where the local governmental entity owed a special duty of care to a particular individual that was different from the duty it owed to the general public. *Coleman*, 2016 IL 117952, ¶ 41.

¶ 40 The public duty rule had been applied in various circumstances where parties sought to impose liability on a public entity's provision of services for the benefit of the public. See, *e.g.*, *Taylor v. Bi-County Health Department*, 2011 IL App (5th) 090475, ¶ 36 (holding that, under the public duty rule, a county health department did not owe an individual duty to require that a child be provided with a specific vaccine); *Donovan v. Village of Ohio*, 397 Ill. App. 3d 844, 850 (2010) (holding that the public duty rule barred claims based on the village's failure to maintain its 911 emergency telephone system); *Ware v. City of Chicago*, 375 Ill. App. 3d 574, 581 (2007) (holding the city did not owe the plaintiffs an individual duty to protect them from a porch collapse); *Sims-Hearn v. Office of the Medical Examiner*, 359 Ill. App. 3d 439, 444 (2005) (holding that, under the public duty rule, the office of the medical examiner did not owe a duty of care to individual citizens to perform duties such as autopsies).

¶ 41 Plaintiffs have presented, as the appellate court recognized, shifting arguments as to the applicability of the public duty rule to defendants' alleged failures surrounding the municipal stormwater system here. Most of plaintiffs' arguments were raised for the first time on appeal to that court, in their reply brief or at oral argument. See 2019 IL App (1st) 170859, ¶¶ 24-26. Similarly, plaintiffs' arguments before this court on the applicability of the rule have been less than clear and consistent. Plaintiffs now assert that defendants' "argument is fundamentally flaw[ed] because [the] claims [in the complaint] arise out of both the failure to maintain public property as well as the planning, design and construction of public property[,] and it was that property which created, what [defendants] always knew, was an unreasonable risk of harm to [them]."

¶ 42 Plaintiffs do not challenge the trial court's determination that the complaint does not support a cause of action based on any special duty, and we see no basis for them to do so. To the extent that plaintiffs allege that defendants failed to provide adequate public services in the design, maintenance, improvement, and/or operation of the stormwater system here, that duty ran to the public at large and not to individual members of the public such as plaintiffs. See *Alexander v. Consumer Illinois Water Co.*, 358 Ill. App. 3d 774, 779 (2005) (holding that summary judgment for the defendant village was proper on the plaintiffs' claims for sewer backup damages because even if the village owed a general duty to the public to prevent sewer backups, the public duty rule barred legal liability to individual

- 12 -

members of the public); *Town of Cicero v. Metropolitan Water Reclamation District of Greater Chicago*, 2012 IL App (1st) 112164, ¶ 41 n.4. (affirming the dismissal of the complaint on other grounds but noting that the public duty rule would appear to bar claims against the District based on flooding and sewer backup damage because a public entity may not be held liable for its failure to provide adequate governmental services); *Remet Corp. v. City of Chicago*, 509 F.3d 816, 820 (7th Cir. 2007) (holding that, under the public duty rule, the city had no duty to provide uninterrupted water service for fire protection). For these reasons, we find the trial court properly held that the public duty rule applied to the allegations contained in the complaint.

¶ 43                                   II. Plaintiffs' Takings Claim

¶ 44        Next, we address defendants' claim that the appellate court erred by holding that plaintiffs stated a takings claim under the Illinois Constitution.

¶ 45        The Illinois takings clause states: "Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law." Ill. Const. 1970, art. I, § 15. This court has defined a taking as a physical invasion of private property or the radical interference with a private property owner's use and enjoyment of the property. *Hampton v. Metropolitan Water Reclamation District*, 2016 IL 119861, ¶ 24 (citing *Forest Preserve District v. West Suburban Bank*, 161 Ill. 2d 448, 456-57 (1994)).

¶ 46        This court has also held that a taking occurs when real estate is physically invaded " 'by superinduced additions of water *** so as to effectually destroy or impair its usefulness.' " *Id.* (quoting *Horn v. City of Chicago*, 403 Ill. 549, 554 (1949)). Flooding that does not cause this level of destruction is not a taking. *Id.* (citing *People ex rel. Pratt v. Rosenfield*, 399 Ill. 247, 252 (1948)); see *Hartwig v. United States*, 485 F.2d 615, 619 (Ct. Cl. 1973) (" 'The essential inquiry [in taking cases arising out of a flood situation] is whether the injury to the claimant's property is in the nature of a tortious invasion of his rights or rises to the magnitude of an appropriation of some interest in his property permanently to the use of the Government.' " (quoting *National By-Products, Inc. v. United States*, 405 F.2d 1256, 1273-74 (Ct. Cl. 1969))).

- 13 -

¶ 47    In *Hampton*, we instructed that there are additional facts in determining whether a temporary flooding constitutes a taking, including the time and duration of the flooding, whether the invasion of the property was an intentional act or a foreseeable result of an authorized government action, and the character of the land and the owner's reasonable investment-backed expectations regarding the use of the land. *Hampton*, 2016 IL 119861, ¶ 25 (citing *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 39 (2012)). We ultimately held that the temporary flooding of the residential properties in *Hampton* was not a compensable taking under the state constitution. The property owners only alleged one instance of flooding, the flooding was not alleged to be recurring, water did not remain on properties for a prolonged period of time, they did not allege that the damage caused by the flooding could not be satisfactorily repaired, and there was no allegation that the flooding was intentional or that the District knew or should have known that flooding would occur. *Id.* ¶ 26.

¶ 48    Here, in the takings claim counts, plaintiffs alleged that defendants had caused plaintiffs' properties "to become partially and/or totally uninhabitable by [their] actions and/or inactions," which resulted in the flooding damage to their properties. Concerning Maine Township, plaintiffs simply alleged that these damages were caused by their "conduct in failing to redesign its PCSS Robin-Dee Main Drain and in failing to sand bag a barrier to [the] North Development stormwater after knowing that the design and construction was dangerous." Similarly, as to Park Ridge and the District, plaintiffs simply alleged the damages were caused by their "conduct in failing to redesign its PCSS Properties after knowing that the design and construction was dangerous."[6]

¶ 49    Property loss is compensable as a "taking" when the government intended to invade a protected property interest or the invasion was the direct or foreseeable result of authorized government action. See *id.* ¶ 25; see also *Arkansas Game & Fish*, 568 U.S. at 39. Because plaintiffs failed to allege that the water flowing onto their property causing the flood damage was the intended or foreseeable result of

---

[6]Before this court, plaintiffs now attempt to argue that the issuance of permit(s) for the development of the stormwater system by one or more of the defendants may support a takings claim. No allegation surrounding the issuance of permit(s), however, was contained in any of the taking counts in the sixth amended complaint.

authorized government actions by one or more of the defendants, we find the trial court properly dismissed the takings claim counts.

¶ 50                                III. Plaintiffs' Cross-Appeal

¶ 51     We now turn to plaintiffs' cross-appeal. They assert that the appellate court erred by dismissing the counts premised on adjacent property owner liability, the duty to maintain property, and the duty to remedy a dangerous plan. If the latter two counts are not reinstated, plaintiffs request that they be allowed to replead them.

¶ 52     As to the purported "adjacent property owner liability count," that claim was made for the first time before the appellate court, when plaintiffs were allowed to abandon their counts against defendants for "dominant estate overburdening." See 2019 IL App 1st 170859, ¶ 68. Simply put, there are no counts for us to reinstate because the ones asserting adjacent property owner liability were not contained in the sixth amended complaint and were not a basis of the trial court's order under review. Concerning the remaining two counts, we have already found that the trial court correctly held the public duty rule applied to plaintiffs' claims against defendants. For the same reasons, the trial court properly dismissed the counts premised on a duty to maintain property and a duty to remedy a dangerous plan because defendants did not owe a discernible duty to plaintiffs. Finally, there is no basis or purpose to allow plaintiffs to replead these counts.

¶ 53                                      CONCLUSION

¶ 54     Accordingly, the judgment of the appellate court is affirmed in part and reversed in part, and the judgment of the circuit court dismissing plaintiffs' sixth amended complaint is affirmed.

¶ 55     Appellate court judgment affirmed in part and reversed in part.

¶ 56     Circuit court judgment affirmed.

¶ 57     JUSTICE KILBRIDE took no part in the consideration or decision of this case.